

Marian F. Harrison
US Bankruptcy Judge

Dated: 7/7/2021



# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) |
| | ) **CASE NO. 320-04290** |
| **JIMMY DON HALE AND** | ) |
| **DIXIE MARIE HALE,** | ) **JUDGE MARIAN F. HARRISON** |
| | ) |
| Debtors. | ) **CHAPTER 7** |
| | ) |
| **STATE OF TENNESSEE,** | ) **ADV. NO. 320-90191** |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **JIMMY DON HALE AND** | ) |
| **DIXIE MARIE HALE,** | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| IN RE: | ) |
| | ) **CASE NO. 320-04291** |
| **DANNY EUGENE HALE,** | ) |
| | ) **JUDGE MARIAN F. HARRISON** |
| Debtor. | ) |
| | ) **CHAPTER 7** |
| **STATE OF TENNESSEE,** | ) |
| | ) |
| Plaintiff, | ) **ADV. NO. 320-90192** |
| | ) |
| v. | ) |
| | ) |
| **DANNY EUGENE HALE,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

The State of Tennessee ("the State"), by and through Herbert H. Slatery III, Attorney General and Reporter, filed these adversary complaints seeking a determination of nondischargeability pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6). The matters are before the Court upon the State's motions for summary judgment based on collateral estoppel, also known as issue preclusion. Pursuant to the Tennessee Consumer Protection Act ("TCPA"), the underlying state court judgments represent a consumer redress award of $18,141,750 ($21,757,674.14 with post-judgment interest). *See* T.C.A. § 47-18-108. For the following reasons, the Court finds that summary judgment should be granted.

## I. UNDISPUTED MATERIAL FACTS

HRC Medical Centers, Inc. ("HRC") offered and advertised "bio-identical" hormone replacement therapy ("BHRT") to men and women. Jimmy Don Hale ("Don Hale") was the president and chief executive officer, Dixie Marie Hale ("Dixie Hale") was the chief administrative officer (and held herself out as a co-owner of HRC), and Dan Eugene Hale ("Dan Hale") was the medical director and chief spokesperson (collectively "debtors"). HRC's BHRT was heavily advertised on television and radio, its website, websites of third parties, social media, and sales brochures and posters located in HRC's clinic locations. The advertisements contained repeated false statements and insiders acting as consumers to promote the false claims.

The State filed a civil law enforcement action in the Davidson County Circuit Court ("state court") under the TCPA, asserting that the debtors engaged in deceptive advertising.

Through three summary judgments, the state court found all three debtors, among others, jointly and severally liable for four widely-disseminated material misrepresentations and one material omission in advertisements. The material misrepresentations found by the state court were: (1) HRC's BHRT "was completely safe;" (2) HRC's BHRT "had no side effects;" *State v. HRC Medical Centers, Inc.*, No. 12C4047, at *36 (2d Cir., Davidson Cty., Tenn. Aug. 31, 2015) ("First Summary Judgment Opinion") (3) HRC's BHRT restored users' hormones to "exactly like" and "biologically identical" to when they were young; *id.* at 18, and (4) HRC used FDA-approved compounding pharmacies. *Id.* at 36. In addition, the state court found that material relationships of insiders posing as consumers in HRC's commercials were undisclosed. *Id. See also State v. HRC Medical Centers, Inc.*, No. 12C4047, at *15-16 (2d Cir., Davidson Cty., Tenn. Feb. 27, 2017) ("Second Summary Judgment Opinion").

The state court awarded a judgment in the amount of $18,141,750, using the following formula: "$2,250 (figure below median price of BHRT) multiplied by 8,463 (lowest number of BHRT consumers asserted by HRC) less $900,000 in refunds." *State v. HRC Medical Centers, Inc.*, No. 12C4047, at *3 n.2 (2d Cir., Davidson Cty., Tenn. July 17, 2017) ("Third Summary Judgment Opinion"). On appeal, the Tennessee Court of Appeals affirmed the decision, and the Tennessee Supreme Court denied the debtors' petition for permission to appeal.

3

All three debtors approved advertisements or reviewed HRC's BHRT advertising claims, had the authority at HRC to change or alter advertisements, personally spoke in deceptive advertisements, and otherwise actively participated in the advertisements. Several consumers offered proof that they would not have signed up for or taken HRC's BHRT had they known the advertising was false.

### A. HRC's BHRT is Completely and Absolutely Safe

"The claim [that] HRC's BHRT was completely or absolutely safe (or through other words conveying the same message) was repeated in sales brochures, television advertisements, social media advertisements, and web postings." *Third Summary Judgment Opinion* at *7. The state court found and cited several examples where Don Hale and Dan Hale "repeatedly represented in advertisements that HRC's BHRT was completely or absolutely safe." *First Summary Judgment Opinion* at *12. "Dixie Hale directly participated in, and had authority to control, HRC's deceptive acts." *Second Summary Judgment Opinion* at *14.

These "statements that BHRT is 'absolutely safe' and that 'no one can find any evidence that BHRT can hurt you in any way'" *First Summary Judgment Opinion* at *13, "were false when made," *Defendants Don and Dixie Hale's Response to Statement of Undisputed Material Facts*, Case No. 320-04290, Adv. No. 320-90191, ECF No. 14, at *5 (March 29, 2021) ("Don and Dixie Hale Response"), *Defendant Dan Hale's Response to Statement of Undisputed Material Facts*, Case No. 320-04291, Adv. No. 320-90192, ECF

No. 14, at *6 (March 29, 2021) ("Dan Hale Response"), and "inconsistent with the possible side effects that Defendants admit are associated with BHRT[,]" which include "a deepening of the voice, unwanted facial hair, acne, increased sexual desire, some agitation, weight gain, fluid retention, dysfunctional uterine bleeding, sore breasts, hair loss, vaginal swelling, and hypertension." *First Summary Judgment Opinion* at *13. Dixie Hale had direct knowledge of the side effects and health risks of HRC's BHRT through her handling of refund requests and contact with individuals at HRC's corporate office who used BHRT. *Second Summary Judgment Opinion* at *15. Despite this knowledge, "Dixie Hale directly participated in, and had authority to control, HRC's deceptive acts." *Id.* at *14.

The state court found that "[b]ased on Defendant[s'] own admissions that no medical treatment, including BHRT is completely safe, the express claim that BHRT is 'absolutely' safe tends to mislead a consumer into thinking there are no risks to the treatment." *First Summary Judgment Opinion* at *15. These representations were material and concerned "an issue of great significance to consumers." *Don and Dixie Hale Response* at *5; *Dan Hale Response* at *6.

### B. HRC's BHRT Has No Side Effects

"The claim that HRC's BHRT had no side effects, without qualification, was repeated in television advertisements, Internet videos and social media." *Third Summary Judgment Opinion* at *9. The state court found these "statements were false by Defendants' own admissions, which shows [sic] that HRC's BHRT is associated with

5

possible side effects that include: hypertension, deepening of the voice, dysfunctional uterine bleeding, hair loss, clitoral hypertrophy, unwanted facial hair, weight gain, fluid retention, endometrial hyperplasia, menstrual and menstrual-like bleeding, erythrocytosis, testicular atrophy, azoospermia, and gynecomastia." *First Summary Judgment Opinion* at *16.

For example, "in a television commercial Defendant Don Hale, on behalf of HRC stated, '[n]o one can find evidence that having your hormone levels raised back like they were in their [sic] youth can hurt you in any way if it's done with natural hormones as opposed to synthetic hormones.'" *Id.* at *12. Don Hale "was aware of BHRT's potential effects before and at the time he made claims that there were no side effects," and he "had the authority to alter or change advertisements in which claims were made that BHRT had no side effects." *Id.* at *29. Don Hale, among others, "made statements in several advertisements that BHRT treatments had no side effects." *Id.* at *15. Dan Hale was aware that BHRT has side effects before or at the time he claimed there were no health risks and that bio-identical hormones were "'completely safe' and are 'not the kind of hormones that are unsafe.'" *Id.* at 30. Dixie Hale directly participated in and had authority to control, HRC's deceptive practices about BHRT. *Second Summary Judgment Opinion* at *14. She "had direct knowledge of the side effects and health risks of HRC's BHRT" "through her handling of refund requests and contact with individuals at HRC's corporate office who used BHRT." *Id.* at *15. "Many of the refund requests Defendant Dixie Hale received from consumers who had purchased HRC's BHRT contained information about side

6

effects the customers had experienced." *Id.* at *9. These side effects included endometrial cancer, thickening of the uterine wall, abnormal cell growth in the endometrial lining, and heart palpitations. *Id.* at *9-10. Despite this knowledge, Dixie Hale reviewed and participated in HRC BHRT advertisements which failed to disclose such information to consumers.

Again, the state court found these multiple representations were false when made, the debtors knew the representations were false before and at the time they were made, and these representations were material and concerned "an issue of great significance to consumers." *First Summary Judgment Opinion* at *13; *Don and Dixie Hale Response* at *5; *Dan Hale Response* at *6.

## C. HRC's BHRT Restores User's Hormones to Prime Levels

HRC's advertisements claimed that BHRT would restore a user's hormone levels to those they had in their twenties, thirties, and in their prime. For example, "Dan Hale personally claimed that 'the key is to replace them (estradiol, progesterone, and testosterone) with hormones that are an exact duplicate of those we had when we were 25 years old. . . . Natural hormones as we had when we were 25 do not have the side effects associated with synthetics." *Id.* at *30. Yet Dan Hale "admits that BHRT was intended to take testosterone levels for both men and women to those that do not naturally exist even in a twenty or thirty year old." *Id.* The state court found that proof of the falsity of the advertising claims that HRC's BHRT restored a user's hormones to the levels that they had

7

in their twenties, thirties, and in their prime comes from the debtors' own admissions. *Id.* at 18. Again, despite this knowledge, the debtors reviewed and participated in HRC BHRT advertisements which failed to disclose such information to consumers.

### D. The Pharmacy Used for HRC's BHRT was FDA Approved

In promotional materials for HRC's BHRT, HRC stated: "'Our pellets are bio-engineered using all natural ingredients by our FDA approved compounding pharmacy. Our pharmacy is one of only two FDA approved pharmacies of their kind in the United States.'" *Id.* at *19-20. "If asked whether HRC's BHRT was FDA-approved, HRC sales representatives were instructed to state, 'The natural hormone pellets we use meet standards set by FDA.'" *Third Summary Judgment Opinion* at *14. In truth, "[t]he FDA never approved the compounding pharmacies that Defendant HRC used to supply the components of its hormone replacement therapy." *First Summary Judgment Opinion* at *20. The state court found that Don Hale and Dan Hale, among others, represented that HRC's BHRT was supplied by an FDA-approved compounding pharmacy, that these representations were false when made, and that these representations were material to the consumer's purchasing decision. *First Summary Judgment Opinion* at *20. Dixie Hale directly participated in or had authority to control all of HRC's deceptive advertising practices about BHRT. *Second Summary Judgment Opinion* at *14.

8

**E.  Failure to Disclose Relationship of Consumers to HRC or its Principals in Testimonial Advertisements**

In testimonial advertisements for HRC, relatives and/or employees pretended to be consumers without disclosing their relationship, ownership interest, or employment.  These testimonial advertisements continued even after Don Hale and Dan Hale were expressly told by an HRC attorney in correspondence, dated September 8, 2011, that all material connections, including employment by the advertiser or other payment, had to be disclosed. *First Summary Judgment Opinion* at *25.  Dixie Hale knew that her husband Don Hale, was a co-owner of HRC and that her son and daughter-in-law worked for HRC at the time they gave BHRT consumer testimonials for HRC without disclosing their connections to the company. *Second Summary Judgment Opinion* at *13.

For example, Don Hale "personally appeared and spoke in several of HRC's BHRT advertisements including advertisements featuring his consumer testimonial without any disclosure of his ownership interest in the company." *First Summary Judgment Opinion* at *28-29.  "On numerous occasions officers, employees and family members, including Don Hale, his son, and his daughter-in-law, appeared as consumers of Defendant HRC's BHRT without disclosing their material connections to Defendant HRC or [its] principals." *Id.* at *24.  Dixie Hale gave a consumer testimonial, stating:  "'I work long hours and it is very important to me that I can continue longer during the day without getting so tired. People are a lot more tired and stressed out than they used to be.  And the hormones can definitely help.  I felt it was safer for me and with the result that I got.  I felt so much better.

I mean it's the perfect fit for me. I have a lot more energy. When I have more energy and I'm feeling better, I'm happier.'" ***Third Summary Judgment Opinion*** at *15. Dixie Hale did not disclose her employment and relationship with the company in the advertisement. ***Id.*** In yet another advertisement, "Don Hale and Dixie Hale gave testimonials without any disclosure of their ownership interest in or employment with the company." ***Id.*** at *15. The state court found these testimonials to be material to the consumer's purchasing decision.

## F. Impact on Consumers

Multiple consumers stated that they would not have purchased HRC's BHRT if they had known about the possible side effects and health risks associated with it. For example, Jane Doe 17 stated, during a sales consultation, an HRC representative indicated HRC's BHRT "had zero side effects and was completely safe." She purchased BHRT for approximately $3000 but would not have done so had she known about the side effects associated with HRC's BHRT. ***Id.*** at *16. "Jane Doe 2 was told by an HRC sales representative during a sales consultation that HRC's BHRT did not have any harmful side effects, purchased BHRT for $2,950, requested a refund, but was told she could only receive store credit for other services, which she refused." ***Id.*** at *17. Jane Doe 21 was also told by an HRC sales representative during a sales consultation that BHRT had no side effects. She purchased BHRT for $2650 and requested but did not receive a refund from HRC. ***Id.*** at *17. Multiple consumers requested refunds, which HRC refused. ***Id.*** at *16-18. These consumers were not reimbursed by any other source. It was Dixie Hale who

reviewed refund requests and determined whether refunds would be given. ***Second Summary Judgment Opinion*** at *9. She denied refunds to consumers who purchased BHRT from HRC and who complained about the side effects. ***Id.***

The state court concluded that "the State . . . has shown, HRC's deception was a substantial factor in causing consumers to purchase products which did not perform as promised" and "the undisputed facts demonstrate causation." ***Third Summary Judgment Opinion*** at *25. Specifically, the debtors' deceptive acts and practices "proximately caused consumers' losses." ***Id.*** at *24-25.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Federal Rule of Civil Procedure 56(a), as incorporated by Federal Rule of Bankruptcy Procedure 7056, an entry of summary judgment is mandated "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court "must view the evidence and draw all reasonable inferences in favor of the nonmoving party." ***Browning v. Levy***, 283 F.3d 761, 769 (6th Cir. 2002) (citation omitted). The Court does not "'weigh the evidence and determine the truth of the matter but . . . determine[s] whether there is a genuine issue for trial.'" ***Id***. (citation omitted).

## III. DISCUSSION

The primary purpose of bankruptcy is to grant a "fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (citation and internal quotation marks omitted). Because the bankruptcy discharge is central to a "fresh start," discharge exceptions "are to be strictly construed against the creditor and liberally in favor of the debtor." *Risk v. Hunter (In re Hunter)*, 535 B.R. 203, 212 (Bankr. N.D. Ohio 2015) (citations omitted). *See also Gleason v. Thaw*, 236 U.S. 558, 562 (1915) (Exceptions to discharge are to be strictly construed.). The burden of proof falls upon the party objecting to discharge to prove by a preponderance of the evidence that a particular debt is nondischargeable. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

### A. Issue Preclusion

The State asks the Court to grant summary judgment on its nondischargability claims under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) based on the state court judgments. In response, the debtors assert that collateral estoppel does not apply because the state court judgments do not address all the elements of these statutory provisions. Specifically, the debtors argue that the state court did not make any findings regarding malice, intent to injure, or whether consumers reliance on the representations were justified.

Collateral estoppel, also known as issue preclusion, "'precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action.'"

*Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 461 (6th Cir. 1999) (quoting

*Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 480 (6th Cir. 1992).

"Principles of collateral estoppel apply in non-dischargeability actions." *Livingston v.*

*Transnation Title Ins. Co. (In re Livingston)*, 372 F. App'x 613, 617 (6th Cir. 2010)

(unpublished) (citations omitted). To determine whether issue preclusion applies to a state

court judgment, the bankruptcy court looks to the relevant state's law to determine whether

the judgment would receive preclusive effect. *Custom Kilns, Inc. v. Pierron (In re*

*Pierron)*, 448 B.R. 228, 236 (Bankr. S.D. Ohio 2011) (citation omitted).


Under Tennessee law, the party asserting issue preclusion has the burden of

demonstrating:

> (1) that the issue to be precluded is identical to an issue decided in an earlier
> proceeding, (2) that the issue to be precluded was actually raised, litigated,
> and decided on the merits in the earlier proceeding, (3) that the judgment in
> the earlier proceeding has become final, (4) that the party against whom
> collateral estoppel is asserted was a party or is in privity with a party to the
> earlier proceeding, and (5) that the party against whom collateral estoppel is
> asserted had a full and fair opportunity in the earlier proceeding to contest
> the issue now sought to be precluded.

*Mullins v. State*, 294 S.W.3d 529, 535 (Tenn. 2009) (citation omitted). Issue preclusion

applies to both issues of law and issues of fact. *Gibson v. Trant*, 58 S.W.3d 103, 113

(Tenn. 2001) (citation omitted).


In holding the debtors personally liable under the TCPA, the state court made the

following findings:

The undisputed facts show that Defendant Don Hale personally appeared and spoke in several of HRC's BHRT advertisements including advertisements featuring his consumer testimonial without any disclosure of his ownership interest in the company. He approved BHRT advertisements, was present at the filming of the advertisements for BHRT and made his office available to be used as a location for the filming of the advertisements. It is further undisputed that Don Hale reviewed BHRT advertising claims and had the authority at HRC to alter or change advertising claims.

As for the claims that BHRT had no side effects, the undisputed facts show that Don Hale was aware of BHRT's potential effects before and at the time he made claims that there were no side effects. Additionally, Don Hale had the authority to alter or change advertisements in which claims were made that BHRT had no side effects. As for the omission of material connections, Don Hale received an email and corresponding attachment from an HRC Medical attorney, which stated, "all material connections between the advertiser and endorser must be disclosed (including employment by the advertiser or other payment to the endorser from advertiser).

The undisputed facts show that Don Hale actively participated in the development of the advertisements and appeared in the advertisements himself, making claims this court has found to be deceptive under the TCPA. Summary judgment is granted on personal liability of Don Hale for the deceptive advertising claims that BHRT was absolutely safe, had no side effects, could restore consumer's hormone levels identical to those they had in their twenties or thirties and was compounded by an FDA-approved pharmacy. Summary judgment is also granted on the personal liability of Don Hale on the omission of material connection claim.

* * * *

Defendant Dan Hale, as HRC's chief spokesperson, played an active role in [] shaping the marketing for HRC's BHRT. Dan Hale appeared in many advertisements for HRC's BHRT until March 2012. The undisputed facts show that Dan Hale was aware that BHRT has side effects at the time he claimed there were no health risks and that bio-identical hormones were "completely safe" and are "not the kind of hormones that are unsafe."

As for the claims that BHRT could restore consumer hormone levels to those they had in their twenties and thirties, Dan Hale personally claimed that "the key is to replace them (estradiol, progesterone, and testosterone) with hormones that are an exact duplicate of those we had when we were 25 years old . . . . Natural hormones as we had when we were 25 do not have the

side effects associated with synthetics. In Dan Hale[']s Amended Second Answer, he admits that BHRT was intended to take testosterone levels for both men and women to those that do not naturally exist even in a twenty or thirty year old. Dan Hale also received the email informing him that material connections must be disclosed.

Summary judgment is granted on personal liability of Dan Hale for the deceptive advertising claims that BHRT was absolutely safe, had no side effects, could restore consumer's hormone levels identical to those they had in their twenties or thirties, and was compounded by an FDA-approved pharmacy. Summary judgment is also granted on the personal liability of Dan Hale on the omission of material connection claim.

***First Summary Judgment Opinion*** at *28-30 (internal citations to the record omitted).

Regarding Dixie Hale, the state court held:

Here, the conclusively-established facts demonstrate Dixie Hale acted, at a minimum, with reckless indifference to the truth or falsity of the misrepresentations set forth in HRC advertisements. As stated above, through her handling of refund requests and contact with individuals at HRC's corporate office who used BHRT, Dixie Hale had direct knowledge of the side effects and health risks of HRC's BHRT. Despite this knowledge, however, she reviewed and participated in HRC HBRT advertisements which failed to disclose such information to consumers. Additionally, Dixie Hale was aware of the ties between HRC and her husband, Don Hale, and her son and daughter-in-law, Drew and Jennifer Hale, when they provided testimonials for HRC.

In sum, the conclusively-established facts demonstrate Dixie Hale directly participated in, or had authority to control, HRC's deceptive practices. Additionally, at a minimum, she acted with reckless indifference to the truth or falsity of the misrepresentations set forth in the advertisements. Accordingly, the State's motion for summary judgment against Dixie Hale is GRANTED. Dixie Hale is individually liable under the TCPA for the deceptive corporate acts of HRC as set forth in the Court's August 31, 2015 order, specifically for mispresenting that its BHRT was completely or absolutely safe, had no or minimal side effects, restored a user's hormones to the levels of one's prime, used a compounding pharmacy that had been approved by the FDA, and for omitting the material connections of consumers to HRC or its principals in BHRT testimonials.

***Second Summary Judgment Opinion*** at *15-16. These findings are final and involve the same parties who fully litigated the issues in state court.

The question in this case is whether the state court's rulings made factual findings that support all elements required under 11 U.S.C. §§ 523(a)(2)(A) and/or (a)(6).

## B. 11 U.S.C. § 523(a)(2)(A)

To prove a case under 11 U.S.C. § 523(a)(2)(A), the creditor must establish four elements by a preponderance of the evidence:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

***Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)***, 141 F.3d 277, 280–81 (6th Cir. 1998) (citing ***Longo v. McLaren (In re McLaren),*** 3 F.3d 958, 961 (6th Cir. 1993)). "[T]o recover under the TCPA, the plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated.'" ***Tucker v. Sierra Builders***, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting T.C.A. § 47-18-109(a)(1)).

While the elements of 11 U.S.C. § 523(a)(2)(A) and the TCPA are not identical, the Court can look to the state court's factual findings to determine whether a nondischargability action would have been supported. ***See Longbrake v. Rebarchek (In re Rebarchek)***, 293 B.R. 400, 408 (Bankr. N.D. Ohio 2002) ("[D]issimilarities between a cause of action under 11 U.S.C. § 523(a)(2)(A) and the Ohio Consumer Protection Act [were] cured by . . . additional findings made by the state court.").

The first element of 11 U.S.C. § 523(a)(2)(A) requires a finding that at the time the misrepresentation was made, the debtor knew it was false or made it with gross recklessness as to its truth. The state court found that Don Hale and Dan Hale knew representations made in the advertisements were false before and at the time they were made. As to Dixie Hale, the state court found that at a minimum, she acted with reckless indifference as to the truth or falsity of the advertisements. In addition, Dixie Hale had direct knowledge of the side effects and health risks of HRC's BHRT through her handling of refund requests and contact with individuals at HRC's corporate office who used BHRT. Under the TCPA, "knowingly" is defined as "actual awareness of the falsity or deception," however, "actual awareness may be inferred where objective manifestations indicate that a reasonable person would have known or would have had reason to know of the falsity or deception." T.C.A. § 47–18–103(11).

The second element of 11 U.S.C. § 523(a)(2)(A) requires an actual intent to deceive the creditor. The state court did not make any specific finding as to the debtors' intent to

deceive because such is not required to find a violation of the TCPA. The Court recognizes that summary judgment is generally inappropriate when intent is at issue, but "summary judgment may be granted where all reasonable inferences defeat the claims of one side." *Sicherman v. Rivera (In re Rivera)*, 338 B.R. 318, 327 (Bankr. N.D. Ohio 2006) (citations omitted).

A debtor intends to deceive a creditor "when the debtor makes a false representation which the debtor knows or should have known would induce another to advance money, goods or services to the debtor." *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001) (citation omitted). Debtors rarely admit to an intent to deceive, so fraudulent intent may be shown through circumstantial evidence. *Id.* (citation omitted). The bankruptcy court must then "consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor." *Id.* at 916-17 (citation omitted).

In the present case, the undisputed material facts relied upon in the state court's judgments reflect the debtors' intent to deceive. Specifically, the debtors knowingly made false representations and omissions with the intent to convince consumers to purchase HRC's BHRT, admitting that the purpose of the advertising was to grow the business. Advertising for HRC's BHRT was extensive across several platforms. The debtors were intimately involved in the advertising and had knowledge of the falsity of statements regarding the product and the omission of the material relationships of consumers to HRC

or its principals. The debtors documented and reviewed the responses to particular advertisements, especially the testimonials, to determine the impact on sales. Even after complaints were received and refunds requested based on undisclosed side effects, the advertising campaign continued and refunds were denied. Based on the totality of the circumstances, as found in the state court's judgments, there is no material dispute that the debtors had the intent to deceive consumers as required under 11 U.S.C. § 523(a)(2)(A). Accordingly, the first two elements under 11 U.S.C. § 523(a)(2)(A) are satisfied by the state court judgments.

The final two elements of 11 U.S.C. § 523(a)(2)(A) require justifiable reliance on the debtors' misrepresentations and a resulting injury. *Tomlin v. Crownover (In re Crownover)*, 417 B.R. 45, 57 (Bankr. E.D. Tenn. 2009). The TCPA does not explicitly require proof of reliance, whether justified or not, on a misrepresentation to prove a violation. *Id.* The state court recognized that the TCPA does not require reliance but concluded that "the State . . . has shown, HRC's deception was a substantial factor in causing consumers to purchase products which did not perform as promised" and "the undisputed facts demonstrate causation." Specifically, the debtors' deceptive acts and practices "proximately caused consumers' losses." In making this finding, the state court cited the undisputed statements of consumers indicating that they would not have purchased HRC's BHRT if the side effects had been disclosed in the advertisements.

As to "justifiable" reliance, "a creditor will be found to have justifiably relied on a representation even though 'he might have ascertained the falsity of the representation had he made an investigation.'" ***Commercial Bank & Trust Co. v. McCoy (In re McCoy)***, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001) (quoting ***Field v. Mans***, 516 U.S. 59, 70 (1995)). Given the barrage of false advertising on multiple platforms and the state court's finding that the advertising was a substantial factor in causing consumers to purchase HRC's BHRT, any consumer purchasing HRC's BHRT after seeing the advertisements would be justified in relying on them and purchasing HRC's BHRT. This is apparent even though an investigation might have revealed HRC's deceptions. ***Id.***

Accordingly, the Court finds that the state is entitled to summary judgment on its 11 U.S.C. § 523(a)(2)(A) claim.

### C. 11 U.S.C. § 523(a)(6)

Pursuant to 11 U.S.C. § 523(a)(6), a debt is nondischargeable when the debt is "for willful and malicious injury by the debtor to another entity or to the property of another entity." From the plain language of the statute, the exception will not apply unless the injury caused by the debtor was both willful and malicious. ***Markowitz***, 190 F.3d 455, 463. ***See also MarketGraphics Rsch. Grp., Inc. v. Berge (In re Berge)***, 953 F.3d 907, 916 (6th Cir. 2020), *reh'g denied* (May 6, 2020), *cert. denied sub nom.,* 141 S. Ct. 1057 (2021) ("A creditor must prove both elements before the debt may be exempted from discharge.").

Willful behavior involves "a deliberate or intentional *injury* . . . not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 57 (1998). Willfulness cannot be proven by showing that the debtor should have known his decisions and actions put the plaintiffs at risk. *Crownover*, 417 B.R. 45, 55 (citation omitted). Instead, willfulness requires that the debtor either intended his actions to cause injury to the creditor or the debtor believed that injury to the creditor was substantially certain to follow. *Markowitz*, 190 F.3d at 464. "[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Geiger,* 523 U.S. at 64.

Malicious conduct, for purposes of 11 U.S.C. § 523(a)(6), is defined as "in conscious disregard of one's duties or without just cause or excuse." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). It typically does not require a specific intent to harm. *Berge*, 953 F.3d at 915. "[W]ithout just cause" means that the debtor did not have a legally sufficient reason or excuse to justify an act or omission that relieves a duty. *Id.* (citations omitted). In the majority of cases, the facts that support a finding of willful conduct under 11 U.S.C. § 523(a)(6) will also support a finding that the debtor acted with malice. *Id.* at 916.

In the present case, the undisputed facts show that the debtors used deceptive advertisements to induce consumers to pay money for a product that the debtors knew had side effects and was not absolutely safe. By the debtors' own admissions, the deceptive

advertisements were meant to grow the business by increasing sales of BHRT. From the facts, the Court can infer, at the very least, that the debtors knew a financial loss to consumers was substantially certain to follow. The debtors knew that the promises made regarding HRC's BHRT were false. They knew that consumers would experience potential side effects. Still, the debtors took money from consumers and then refused refund requests when those side effects came to light. The same is true for malice. The undisputed facts show that the debtors knowingly lied to consumers in order to make a profit. Any company or person promoting medical treatment certainly has a duty to tell the truth about their product. The Court cannot imagine any possible reason or excuse to justify these actions and omission.

Accordingly, the Court finds that the state is entitled to summary judgment on its 11 U.S.C. § 523(a)(6) claim.

## IV. CONCLUSION

For the reasons stated, the Court finds that summary judgment as to each debtor should be granted on all elements of nondischargeability under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.